IN THE DISTRICT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN
\* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | 3:20-CR-27-RAM-RM |
| | ) | |
| GILBERTO ARANA WENCE, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

**REPLY TO RESPONSE TO AMENDED MOTION TO DISMISS THE INFORMATION BECAUSE 8 U.S.C. §1326 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS***

This reply is limited to responding to the arguments raised in the government's opposition (ECF No. 58), and will not repeat argument's previously raised.

**1. The Court should apply strict scrutiny**

The government has urged the Court to analyze the constitutional challenge in this case under a "rational-basis review." (ECF No. 58 at 4-9). While the Supreme Court has used "rational-basis review" to evaluate other types of constitutional challenges to congressional acts, the Supreme Court has made quite clear that constitutional challenges based on racial discrimination are different. The government wants to ignore that Mr. Wence is making a race-based challenge to § 1326 by trying to categorize Mr. Wence's motion as an attack simply to an immigration law. The Court cannot simply ignore, however, that this is a clear race-based challenged.

The government cites *United States v. O'Brien*, 391 U.S. 367 (1968), in its effort to recast the nature of Mr. Wence's race-based challenge. (ECF No. 58 at 18). In *O'Brien*, the Supreme Court evaluated a First Amendment challenge to a criminal law prohibiting destruction or mutilation of draft registration cards. The Court, looking at the First Amendment challenge and using the rational basis review standard, rejected Mr. O'Brien's argument that because Congress enacted the law with a

1

wrongful purpose—the suppression of speech, that intention made the law unconstitutional. *Id.* at 383-86. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 n.10 (1977) (citing this very section in *O'Brien*), the Supreme Court acknowledged that some previous cases created tension with the appropriate focus of a constitutional challenge—a law's unconstitutional effect verses a law's unconstitutional purpose. But, the Supreme Court made very clear in *Arlington Heights* that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534-38 (1993) (analyzing discriminatory purpose of law to target religious group in Free Exercise context, which like racial discrimination, triggers the Court's strictest scrutiny); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (discussing historical cases involving laws enacted with the purpose of racial discrimination); *NAACP v. McCrory*, 831 F.3d 204, 233-34 (4th Cir. 2016) (rejecting trial court's use of rational-basis review in race-based constitutional challenge).

The government cites a host of cases for the proposition that Congress has the authority to enact immigration statutes. (ECF No. 58 at 4-6) But a review of those cases shows that their context was entirely different than here. For example, *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) addressed a claim that Congress lacked authority to enact section 1326 either under either its immigration power or its enumerated foreign commerce power. It did not address claims of racial discrimination at all. The issue presented in *Osorio-Martinez v. Attorney-General*, 893 F.3 153, 158 (3d Cir. 2018) was "[d]oes the jurisdiction-stripping provision of the INA operate as an unconstitutional suspension of the writ of habeas corpus as applied to SIJ designees seeking judicial review of orders of expedited removal?" Once again, racial discrimination was not at issue. The Supreme Court framed the issue in *Kleindienst v. Mandel*, 408 U.S. 753, 754 (1972) as " whether §§ 212(a)(28)(D) and (G) (v) and s 212(d)(3)(A) of the Immigration and Nationality Act of 1952, 66 Stat. 182, 8 U.S.C. ss 1182(a)(28)(D) and (G)(v) and s 1182(d)(3)(A), providing that certain aliens 'shall be ineligible to receive visas and shall be excluded from admission into the United States' unless the

Attorney General, in his discretion, upon recommendation by the Secretary of State or a consular officer, waives inadmissibility and approves temporary admission, are unconstitutional as applied here in that they deprive American citizens of freedom of speech guaranteed by the First Amendment." *Catholic Social Servs. v. Reno*, 134 F.3d 921 (9th Cir. 1998) involved a class action litigation challenging the lawfulness of an Immigration and Naturalization Service ("INS") policy adopted in 1986 and revised in 1987 as part of the INS's administration of the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255a ("IRCA").[1] *Fiallo v. Bell*, 430 U.S. 787 (1977) involved a challenge to portions of the INA relating to special preference immigration status, and did not involve claims of racism. *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) addressed a challenge to regulations excluding all persons except American citizens and natives of Somoa from employment in most positions of civil service, and did not address criminal law in any way. Similarly, *Trump v. Hawaii*, 138 S.Ct. 2392 (2018) has no application to criminal cases, nor did it involve legislation, as it addressed a Presidential Proclamation putting into effect the President's "Muslim ban."[2]

Context is everything. While the government may find cases discussing Congress's expansive authority over legislation involving immigration, that is a far cry from precedent involving allegations of racism in enacting a criminal statute. The government cites no Supreme Court cases holding that criminal statutes enacted in significant part based on racial animus are subject to a rational basis test. The government cites a number of circuit cases supporting the rational basis test (Answering Brief at

---

[1] That statute established a legalization program under which certain aliens unlawfully present in the United States could apply for status as temporary residents, and then seek permission to reside permanently in the United States. *See* 8 U.S.C. §§ 1255a(a), (b). Among other requirements, IRCA provided that to be eligible, applicants had to prove continuous physical presence in the United States since November 6, 1986. 8 U.S.C. § 1255a(a)(3)(A). Plaintiff's challenged an INS directive interpreting the continuous physical presence requirement of § 1255a(a)(3)(A) to mean that in order to qualify for adjustment of status, aliens must have obtained INS approval before leaving the United States for even the briefest of absences (the "advance parole policy"). Racism was not raised as an issue.
[2] *See id.* at 2417; *see also dissenting opinion,* 138 S.Ct. at 2430, 2433, 2436, 2438.

6-7)—but none of those cases involved either criminal statutes or claims that racial animus motivated the passage of legislation.

Because context is everything, contrary to the government's argument (ECF No. 58 at 7), *Hunt v. Cromartie*, 526 U.S. 541 (1999) bears heavily on the proper level of scrutiny here. *Hunt* involved claims that statutory redistricting statutes were racially motivated. It explained that a facially neutral law is subject to strict scrutiny if the law was "motivated by a racial purpose or object" or if it is "unexplainable on grounds other than race." *Id.* at 546 (citations omitted). That is precisely what Mr. Wence argues here—that the law was "motivated by a racial purpose or object." Whether other challenges to statutes not raising claims of a motivating racial purpose are subject to rational basis review is simply irrelevant.

The government claims that §1326 satisfies strict scrutiny based on the compelling interest in protecting territorial integrity and the borders. (ECF No. 58 at 7&fn.5). But the cited authority is inapposite. *United States v. Cortez-Rocha*, 394 F.3d 1115 (2005) and *United States v. Flores-Montano*, 541 U.S. 149 (2004) addressed the propriety of searches at the border, and did not address claims of racial animus leading to enactment of legislation. Thus, these cases do not demonstrate satisfaction of strict scrutiny under *Arlington Heights*.

The government argues that because §1326 addresses the unlawful presence of "undocumented aliens," rational basis is implicated because "undocumented aliens" are not a suspect class. (ECF No. 58 at 7-8). "Undocumented aliens" may not be a suspect class, but it is beyond dispute that a race and national origin are suspect classes. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 219 (1995). The few criminal cases cited by the government in regard to rational-basis do not involve arguments of racial animus on the part of Congress in enacting legislation. (*See* ECF No. 58 at 8-9 (*citing United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1008); *United States v. Lopez-Flores,* 63 F.3d 1468, 1470 (9th Cir. 1995); *United States v. Ruiz-Chairez,* 495 F.3d 1089 (9th Cir. 2007))).

4

### 2. Subsequent reenactments do not cure the taint of improper purposes

The government's argument that subsequent reenactments of the law have dissipated the clear discriminatory origins of the law also fails. (*See* ECF No. 58 at 12-14). Later enactments of racially discriminatory laws and policies do not save them from an Equal Protection challenge. *See, e.g., United States v. Fordice*, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation."); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 n.44 (2020) (observing that later reenactments of racially discriminatory law did not save scrutiny of original purposes). There have been no major changes to the illegal reentry law that Congress enacted in 1926. The basic punishment even remains the same nearly 100 years later—up to two years in prison.

The government's citations to subsequent legislation demonstrate as much. For example, the government claims that Congress has updated §1326 multiple times, "and always to increase its deterrent value." (ECF No. 58 at 4). Nowhere in the government's discussion of six different pieces of legislation (ECF No. 58 at 4, 12) does the government argue that Congress took a comprehensive look at the underlying basis and history of criminal immigration laws and penalties. Instead, the government's summary demonstrates that Congress consistently accepted the basic structure of criminal immigration law as it was drafted in the 1920's, and only sought to (1) expand the sweep of criminal immigration statutes, ratchet up punishment for violations of those statutes, and (3) make it more difficult to defend against alleged violations of those statutes. The government argues that subsequent legislation "each time strengthened" the criminal sanctions first created in 1929. (ECF No. 58 at 12). The government's summary of subsequent reenactments demonstrates that not only was the taint of racism in the original statute not cured by subsequent litigation, the taint was actually expanded and intensified. Contrary to the government's arguments (ECF No. 55 at 19), evidence that racist motivations were jettisoned is absent from the record.

The government argues that "[l]egislative intent is not an artifact that 'carr[ies] over' from one law to the next. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980)(pl. op.)". Once again, the government ignores the context of that case. In *Bolden*, the plaintiffs brought a class action suit challenging the constitutionality of Mobile's at-large method of electing commissioners, based on race. In part, the Court below relied upon findings that Mobile had engaged in racial discrimination against the plaintiffs' racial group in the completely disparate areas of municipal employment and availability of public services. *Id.* at 74. The government's citation to *Bolden* for the proposition that each piece of legislation must be evaluated without considering other legislation preceding it ignores the fact that *Bolden* did not involve a statute which was enacted, and then subsequently reenacted and "strengthened." Instead, *Bolden* addressed completely separate acts by Mobile that bore no relationship to the issue of electing commissioners. In other words, *Bolden* did not address re-enactments of existing legislation; it addressed unrelated enactments of completely separated legislation.

The government's citation to *Palmer v. Thompson*, 403 U.S. 217 (1971) is without merit, as that case has been abrogated, at least implicitly. (*See* ECF No. 58 at 12). In *Palmer*, a deeply divided Supreme Court upheld a municipality's decision to close all public pools against a challenge that the municipality closed the pools in order to avoid having blacks and whites swim together. The Court held that a discriminatory motivation does not invalidate a facially neutral law, and thus that the pool closing, which on its face impacted on whites equally with blacks, did not violate the blacks' equal protection rights irrespective of the legislature's intent. *Id.* at 224–25.

The Supreme Court has never expressly overturned *Palmer,* but it has all but done so. The Court has held several times that facially neutral laws may run afoul of the Equal Protection Clause if they are enacted or enforced with a discriminatory intent. *E.g., Washington v. Davis,* 426 U.S. 229, 244 n. 11 (1976) ("To the extent that *Palmer* suggests a generally applicable proposition that legislative purposes is irrelevant in constitutional adjudication, our prior cases ... are to the contrary."). In *Hunter v. Underwood,* 471 U.S. 222 (1985), the Court faced a law that denied franchise to anyone who had

6

committed "any crime ... involving moral turpitude." *Id.* at 223, 105 S.Ct. at 1918. The plaintiffs challenged the law on the grounds that, though neutral on its face, its purpose was to discriminate against blacks. The district court, citing *Palmer,* upheld the law on the grounds that, because it was neutral on its face, "proof of an impermissible motive for the provision would not warrant its invalidation." *Id.* at 225, 105 S.Ct. at 1919. The Supreme Court unanimously reversed. Without reconciling *Palmer,* the Court held that where "a neutral state law ... produces disproportionate effects along racial lines ... '[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection clause.' " *Id.* at 227–28 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65 (1977)); *accord Rogers v. Lodge,* 458 U.S. 613 (1982). *Arlington Heights* itself is another example of abrogation.

These cases demonstrate that the government is simply wrong when it claims that motive-probing is virtually, if not actually, forbidden. (ECF No. 58 at 18). *Washington v. Davis, Hunter v. Underwood*, and *Arlington Heights* all post-date *United States v. O'Brien*, 391 U.S. 367 (1968), which the government relies upon. (ECF No. 58 at 18).

### 3. The factual basis of Mr. Wence's motion stands unrebutted

The government discusses some of the quotations ascribed to various public officials. (ECF No. 58 at 15-17). The government does not claim that the quotations cited by Mr. Wence are false. Rather, the government claims that they are incomplete or selectively edited, and provides additional quotations. But as the government ultimately concludes, "[t]he point is not that these Congressmen did not say things that they shouldn't have." (ECF No. 18 at 18). The end result is that the government does not contest that the public officials said what Mr. Wence claimed they said—the government only adds more of what they said. Mr. Wence does not take issue with the additional quotations of public officials brought forth by the government. Thus, there does not appear to be a factual dispute as to the statements attributed to public officials.

7

Nor does the government dispute any of the other factual representations included in Mr. Wence's motion or the attachments. For example, the government never mentions the Declaration of Professor Hernandez at all, or her qualifications. (*See* ECF No. 55-2, 55-14). Nor does the government make a general denial of the attachments to Mr. Wence's motion.[3] Other attachments reflect portions of the Congressional Record, which the government does not challenge as false, and would not reasonably be subject to such challenge. (*See* ECF Nos. 55-3, 55-4, 55-5, 55-6, 55-7, 55-8, 55-9, 55-10, 55-11, 55-12, 55-13). The government challenges none of the facts cited by Mr. Wence, and even requests that the Court "deny the motion without an evidentiary hearing." (ECF No. 58 at 19-20). Thus, the government accepts the facts as presented, and only challenges the legal arguments raised by Mr. Wence based on those facts.

Moreover, the government's argument that the materials Mr. Wence submitted in support of his motion do not necessarily represent the intent of every congressperson also belies the state of the law. As the Supreme Court in *Arlington Heights* observed:

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

429 U.S. at 265-66. The legislators that Mr. Wence identified and quoted in his motion also were not random congress members. They were the drafters of the legislation and the heads of the immigration committee. And their views, which were not privately held but rather published publicly in the congressional record, are attributable to other members who chose not to refute the racism. *See, e.g.,*

---

3 In addition to carefully reviewing the government's motion, undersigned counsel performed numerous word searches, including "Hernandez" and "att" which uncovered no citations to any exhibits.

*Staub v. Proctor Hospital*, 562 U.S. 411, 419-22 (2011). The fact that legislators may have had motives that were not entirely racist (ECF No. 52 at 16) does not undermine Mr. Wence's arguments.

The government claims that there is no cognizable disparate impact, since Mexico's proximity explains the disproportionate rate of charging. (ECF No. 58 at 15). But that is precisely why the legislation was enacted in the first place—to keep out those who Congress found undesirable. Similarly, the government's observation that racial animus was lacking in 1929 because people from Mexico were not subject to the 1924 quotas ignores the reality that there was tension between agricultural growers (who wanted cheap labor) and racist legislators (who wanted racial purity). Mr. Wence explained as much (ECF No. 52 at 8-9), and explained that the tension was solved by criminalizing border crossing after the fact, thereby allowing growers to use labor during peak season, after which authorities could expel Mexicans through a criminal prosecution after the growing season was over. (ECF No. 52 at 9-10).

**Conclusion**

Based on the undisputed factual record, racial animus motivated the enactment of §1326. Subsequent reenactments only built on and strengthened the punishments racism helped bring about. For the reasons expressed herein and in his motion, the motion to dismiss should be granted.

Dated: November 20, 2020

Respectfully submitted,

s/ Matthew Campbell
MATTHER CAMPBELL
Federal Public Defender
Office of the Federal Public Defender
1336 Beltjen Road, Suite 202
St. Thomas, VI 00802
Tel (340) 774-4449
Fax (340) 776-7683
E-mail: matt_campbell@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of November, 2020, I electronically filed the foregoing Reply to Response to Amended Motion to Dismiss the Information Because 8 U.S.C. §1326 Violates Equal Protection Under *Arlington Heights* with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Alessandra Parisi Serano
DOJ-USAO
U.S. Attorney's Office
District of the Virgin Islands
5500 Veterans Drive, Suite 260
St. Thomas, VI 00802
340-715-9415
Email: alessandra.p.serano@usdoj.gov

                                            s/ Matthew Campbell
                                            MATTHER CAMPBELL
                                            Federal Public Defender
                                            Office of the Federal Public Defender
                                            1336 Beltjen Road, Suite 202
                                            St. Thomas, VI 00802
                                            Tel (340) 774-4449
                                            Fax (340) 776-7683
                                            E-mail: matt_campbell@fd.org