## DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:20-cr-0027** |
| ) | |
| **GILBERTO ARANA WENCE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ATTORNEYS:**

**Gretchen C.F. Shappert, United States Attorney**
**Alessandra Parisi Serano, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America,*

**Matthew Campbell, Federal Public Defender**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
    *For Defendant Gilberto Arana Wence.*

## <u>MEMORANDUM OPINION</u>

**MOLLOY, C.J.**

    **BEFORE THE COURT** is Defendant Gilberto Arana Wence's ("Wence") Amended Motion to Dismiss the Indictment Because 8 U.S.C. 1326 Violates Equal Protection Under *Arlington Heights*[1] (hereinafter "motion"), filed November 13, 2020. ECF No. 55. The United States of America (the "Government") opposes Wence's motion. ECF No. 58. For the reasons set forth below, the Court will deny the motion to dismiss.

### I.    BACKGROUND

    On July 13, 2020, the Government commenced this case by filing a complaint against Wence. ECF No. 1. On August 10, 2020, the Government filed an information alleging a single

---

[1] Wence here refers to *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

count of Re-entry of a Removed Alien, in violation of 8 U.S.C. § 1326(a). ECF No. 35. On November 13, 2020, Wence filed a motion to dismiss the information captioned "Amended Motion to Dismiss the Indictment Because 8 U.S.C. § 1326 Violates Equal Protection Under *Arlington Heights*.[2] ECF No. 55.

In his motion, Wence argues that 8 U.S.C. § 1326 violates the Fifth Amendment's guarantee of equal protection. Specifically, Wence argues that 8 U.S.C. § 1326 was enacted with the intent to discriminate against Mexican citizens and has a disparate impact on Mexican and other Latinx individuals, and therefore is unconstitutional under *Arlington Heights*, 429 U.S. 252 (1977). *See, e.g.,* ECF No. 55, at 2.

## II.    DISCUSSION

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497) (1954)). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,* 538 U.S. 188, 194 (2003) (internal citations and quotations omitted). "Intentional discrimination can be shown when: (1) a law or policy explicitly classifies citizens on the basis of race,[3] (2) a facially neutral law or policy is applied differently on the basis of race,[4] or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact.[5]" *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (internal citations moved to footnotes).[6]

---

[2] Wence originally filed an overlong motion on the same date. ECF No. 52. This motion was withdrawn due to it being filed in violation of Local Rule of Civil Procedure 7.2, which strictly limits the length of motions to twenty pages. The motion was amended and refiled the same day in compliance with the rule.

[3] *See Hunt v. Cromartie*, 526 U.S. 541 (1999).

[4] *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

[5] *See Arlington Heights*, 429 U.S. 252.

[6] *Antonelli* analyzes the equal protection clause expressly contained in the Fourteenth Amendment, rather than the equal protection component read into the Due Process Clause of the Fifth Amendment. Importantly, however, the two analyses are identical. The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Weisenfeld*, 420 U.S. 636, 638 n. 2 (1975) (collecting cases).

Where a defendant challenges a law as motivated by discriminatory intent and having a racially discriminatory impact, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Davis,* 429 U.S. at 241-42; *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 145 (3d Cir. 1977). If a discriminatory purpose is found to be a motivating factor for the government's decision, a court must apply the strict scrutiny test, as it would to a law involving a facial classification on the basis of race. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). "The purpose of strict scrutiny is to 'smoke-out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion of O'Connor, J.). "The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.*

Absent proof of a discriminatory purpose, courts apply a rational basis standard of review. *Arlington Heights*, 439 U.S. at 265-66; *Doe ex rel. Doe v. Lower Merion School Dist.*, 665 F.3d 524, 544 (quoting *United States v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992)) ("However, 'absent a racially discriminatory purpose, explicit or inferable, on the part of the [decisionmaker], the statutory distinction is subject only to rational basis review.").

Here, Wence challenges the constitutionality of 8 U.S.C. § 1326, alleging the third circumstance: that 8 U.S.C. § 1326 is facially neutral, but is motivated by discriminatory intent and has a racially discriminatory impact. ECF No. 55, at 2. The Government responds that 8 U.S.C. § 1326 is subject to the rational basis standard of review due to Congress's plenary power over immigration. *See* ECF No. 58, at 4-9. The Government contends that, pursuant to Congress's plenary power over immigration, *all* immigration laws are subject to the rational basis standard, regardless of whatever classifications they might make, and thus are not subject to the *Arlington Heights* test, or required to be reviewed under strict scrutiny for any other equal protection challenge. *Id.* Wence responds that his race-based challenge to 8 U.S.C. § 1326, a criminal law, requires the application of strict scrutiny because the

plenary powers afforded to immigration laws do not absolve Congress of its responsibility to enact laws that do not discriminate on the basis of race. *See generally* ECF No. 59.[7]

### a. *Arlington Heights* applies to 8 U.S.C. § 1326.

The Court must first determine whether the discriminatory intent test outlined in *Arlington Heights* applies to a criminal immigration law such as 8 U.S.C. § 1326. As a threshold matter, the Government argues that the *Arlington* Heights framework does not apply to immigration laws. Specifically, the Government argues that classifications that apply to undocumented aliens are to be automatically addressed under the rational basis standard of review, due only to their status as undocumented aliens. ECF No. 58, at 4. By extension, the Government contends that classification on the basis of alienage takes precedence over any other incidentally present classifications, such as race. *Id.* at 9.

To the Government's credit, it has been repeatedly held that Congress holds unusually broad authority over immigration matters. *See, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.").

However, the Court can find no support for the proposition that criminal laws enacted by Congress, even when they are enacted in furtherance of Congress's broad immigration power, are otherwise immune from Constitutional review, particularly that they are immune from upholding a right so fundamental as the equal protection of this nation's laws. Nor does the Government cite any cases in its opposition that squarely address this issue. To the contrary, the Supreme Court has held:

> "The general rule [of presumptive constitutionality] gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and

---

[7] The Government further argues that even if strict scrutiny applies, the more rigorous standard is nevertheless satisfied by 8 U.S.C. § 1326. ECF No. 58, at 7 n. 5. Wence, in turn, asserts that strict scrutiny is not satisfied. ECF No. 59, at 4.

antipathy-a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."

*City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

It is well-settled that all criminal defendants are entitled to the constitutional guarantee of due process of law as secured by the Fifth Amendment, regardless of citizenship. *See Wong Wing v. United States,* 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987) (noting that 8 U.S.C. § 1326 must "comport with the constitutional requirement of due process"). Simply, Congress's plenary power over immigration matters cannot be constitutionally reconciled to allow for *carte blanche* in enacting racially discriminatory statutes in violation of the Fifth Amendment and its guarantee of equal protection.

A plurality of the Supreme Court, as well as the Ninth Circuit, recently declined to apply the highly deferential rational basis standard of review advocated by the Government to an equal protection challenge of immigration decisions by President Trump. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020). In *Ramos* and the Ninth Circuit's pre-*certiorari* decision in *Regents*, the Ninth Circuit applied *Arlington Heights* rather than automatically employ a more deferential standard of review to equal protection challenges of the executive branch's repeal of immigration enforcement policies, citing considerations that included "the physical location of the plaintiffs within the geographic United States, the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised." *Wolf*, 975 F.3d at 896 (quoting *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)).

The Supreme Court's plurality opinion in *Regents* likewise applied the *Arlington Heights* framework to the repeal of the Deferred Action for Childhood Arrivals ("DACA") program by the Acting Secretary of the Department of Homeland Security, as did Justice Sotomayor's concurring opinion. *Regents*, 140 S. Ct. at 1916; *id.* at 1918 (Sotomayor, J., concurring). The import of these decisions is that they directly contradict the Government's argument that *any* classification, when made in the context of immigration, is automatically subject to rational basis review. ECF No. 58, at 4. Moreover, each of these decisions apply the *Arlington Heights* framework to equal protection challenges where the challenged immigration action was facially neutral but enacted with an allegedly racially discriminatory purpose, rather than require that an immigration law facially discriminate on the basis of race to warrant examination. *Regents*, 140 S. Ct. at 1915; *Ramos*, 975 F.3d at 896-97. The fact that Wence challenges a criminal law, rather than an executive policy setting immigration privileges and priorities, further buttresses the premise that his equal protection challenge is reviewable under more than the highly deferential rational basis standard offered by the Government.

That these previous decisions have applied *Arlington Heights* to executive immigration decisions, rather than acts of Congress, is of no consequence. The Government has provided no convincing justification for why the President, in executing the immigration laws enacted by Congress through administrative action, would be subject to constitutional equal protection constraints that Congress is free to disregard. Further, it strains credulity – and is without basis in law – to conceive that courts would be unable to review a criminal law that, on its face, targets a particular racial group merely because the offense relates to immigration – for example, if 8 U.S.C. § 1326 explicitly prescribed harsher penalties for Latinx aliens. The Supreme Court has unequivocally stated that both facially discriminatory laws and facially neutral laws enacted with discriminatory animus may violate equal protection. *See, e.g., Washington*, 426 U.S. at 241.

A criminal immigration statute passed by Congress is not immune from scrutiny because the defendant seeks to prove the equal protection violation through a racially discriminatory Congressional motive rather than a facial classification on the basis of race.

Accordingly, the Court finds that 8 U.S.C. § 1326 must be reviewed under the *Arlington Heights* framework to determine whether the statute deprives Wence of the Fifth Amendment's guarantee of equal protection, and what standard of review must be applied thereto.[8]

### b. Wence has not met his burden under *Arlington Heights.*

Under *Arlington Heights*, Wence must show that a discriminatory purpose was a motivating factor for the government's decision to warrant review of 8 U.S.C. § 1326 under strict scrutiny. If this burden is not met, 8 U.S.C. § 1326 is subject to the more deferential rational basis review. In *Arlington Heights*, the Supreme Court set forth a non-exhaustive list of factors that courts should look to in order to determine whether a discriminatory purpose was a motivating factor for a governmental decision, noting that such analyses "demand[] a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 265-58.

### 1. The Court must consider the Congressional motivation underlying the enactment of 8 U.S.C. § 1326, the statute which Wence is charged with violating.

Having determined that Wence is entitled to challenge the Information under *Arlington Heights*, the Court must turn to the task of discerning Congress's intent. *Arlington Heights* instructs that the "sensitive inquiry" of "[d]etermining whether invidious discriminatory purpose was a motivating factor" for the legislative enactment requires looking to the disparate impact of the official action, "[t]he historical background of the decision"; "[t]he specific sequence of events of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" ("[s]ubstantive departures ...,

---

[8] The Court notes that if 8 U.S.C. § 1326 were evaluated under strict scrutiny, additional questions arise as to the level of deference afforded to the Government's offered "compelling interest" for the law. So much so that the Court questions whether such an evaluation gives rise to a distinction without a difference. The application of strict scrutiny to immigration-related laws is not well settled. In fact, far from it. "Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate the narrow standard of review of decisions made by the Congress or the president in the area of immigration or naturalization." *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976). While the Court certainly wades into this area with the "greatest caution," it ultimately need not reach the application of strict scrutiny, nor need it require the Government's proffer as to if or why 8 U.S.C. § 1326 would have been passed without any racial animus, *Arlington Heights*, 429 U.S. at 270 n. 21, as Wence does not meet his burden under *Arlington Heights* to trigger the application of strict scrutiny.

particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"); and "[t]he legislative or administrative history ..., especially when there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266-68.

The initial question for this Court, however, is which Congress's intent is subject to review. Wence argues that the Court should look back to the initial enactment of the first statutes to criminalize illegal entry and reentry as predecessors to 8 U.S.C. § 1326, which occurred in 1929. ECF No. 55, at 5-16. The Government contends that the Court must look to the "governing statutory framework" of the current form of 8 U.S.C. § 1326, enacted in 1952. ECF No. 58, at 12.

In 1929, Congress enacted the Undesirable Aliens Act, which provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials ... shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. The Immigration and Nationality Act of 1952, the first comprehensive immigration law, recodified existing provisions under title 8 of the U.S. Code and continued to criminalize unlawful entry. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. 8 U.S.C. § 1326 was enacted in its current form in the Immigration Act of 1990, criminalizing attempted unlawful reentry in addition to unlawful reentry. Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3) 104 Stat. 4978 (codified as amended 8 U.S.C. § 1326(a)).

*Arlington Heights* allows for the consideration of historical circumstances. Wence has presented extensive legislative history for the 1929 Undesirable Aliens Act and the declaration of a historian, Dr. Kelly Lytle Hernandez, supporting his contention that members of the 1929 Congress sought to criminalize unlawful reentry, at least in part, because of their endorsement of eugenics and the perceived inferiority of the "Mexican race." ECF No. 55, at 6-16; ECF No. 55-2 through 55-13. This information is certainly relevant to the Court's consideration of the historical backdrop against which 8 U.S.C. § 1326 was adopted. *Cf. Rogers v. Lodge*, 458 U.S. 613, 624-25 (1982) (considering past laws intended to disenfranchise Black people as evidence of intent that at-large election system was adopted

with discriminatory purpose); *Resident Advisory Bd.* 564 F.2d at 143 (inferring discriminatory purpose from the City of Philadelphia's shift in position from passive acceptance to active opposition to a Public Housing Authority contractor's proposal for construction of a housing project inconsistent with the city's ongoing practice of *de jure* segregation). However, *Arlington Heights* directs the Court to look at the motivation behind the official action being challenged. *See Arlington Heights*, 429 U.S. at 265-67 (describing intent analysis in terms of "the challenged decision"). The challenged decision at issue here is the decision to criminalize the conduct Wence is charged with committing: the re-entry of a removed alien. This means that the Court must seek to discern the intent of the Congress that enacted that charged provision, rather than the intent of previous Congresses.

Wence's reliance on *Ramos v. Louisiana* and *Espinoza v. Montana Department of Revenue* is inefficacious. These cases certainly support the contextless proposition for which Wence cites them, that subsequent enactments of a statute do not entirely "cleanse the law of its original taint." ECF No. 55, at 17. But *Ramos* and *Espinoza*, neither of which involved an equal protection challenge, did not hold, as Wence would purport, that the discriminatory motivations of a previous legislature are dispositive of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 (2020); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020). Crucially, despite the well-documented discriminatory history of the provisions at issue in both cases, neither *Ramos* nor *Espinoza* found that the currently operative provisions had been enacted with discriminatory intent, as is required to find an equal protection violation under *Arlington Heights. See Ramos*, 140 S. Ct. at 1401 n. 44 (noting dissent's argument that "Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism," and disagreeing with the import, but not the accuracy, of that claim); *Espinoza*, 140 S. Ct. at 2259 (noting, and not questioning, Montana's argument that it reimplemented the no-aid provision in the 1970s "for reasons unrelated to anti-Catholic bigotry"). To the contrary, these decisions merely confirm that the historical context of legislative enactments are relevant, a point already incorporated in the *Arlington Heights* framework.

In some circumstances, the legislative history of past enactments may be highly probative of the motivations of the legislators who enacted the current law, but the Court cannot automatically impute these past motivations to the current law and forgo analysis of the enacting legislature as directed by *Arlington Heights*. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). The Court therefore must consider whether Wence has shown that Congress' 1952 implementation of 8 U.S.C. § 1326 was motivated at least in part by a discriminatory purpose.

### 2. Wence has not shown that 8 U.S.C. § 1326 was enacted with a racially discriminatory purpose.

The Court will address the *Arlington Heights* factors in turn to determine whether Wence has shown that "invidious discriminatory purpose" was a motivating factor in the enactment of the current 8 U.S.C. § 1326. *Arlington Heights*, 429 U.S. at 266.

### i.  Historical Background

In his motion to dismiss, Wence describes at length the historical background of the 1929 Undesirable Aliens Act, the precursor for today's provision criminalizing unlawful reentry. He points to comments made on the floor of Congress that show several legislators who were involved in the passage of the 1929 Act viewed it as a means of fighting against the "hordes" of Mexicans, as well as to the endorsement of eugenics among some legislators in the context of the broader immigration debate. ECF No. 55-2 ("Hernandez Decl.") at 5-7, 9; ECF No. 55-3 (*Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. On Immigration and Naturalization*, 70th Cong. (1928) (Statement of Harry H. Laughlin)). Some legislators unabashedly endorsed white supremacy and directly tied the goal of preventing long-term immigration of Mexicans to "protect[ing] American blood from alien contamination." ECF No. 55, at 11; ECF No. 55-3, at 3; ECF No. 55-7, at H2452.

This history suggests that at least some members of Congress were motivated to support immigration restrictions at least in part by a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable. The Government argues that the fact that countries in the Western Hemisphere were not subject to numerical quotas at the time "considerably undercut[s]"

Wence's argument. ECF No. 58, at 15. However, the Government does not address Dr. Lytle Hernandez's explanation that this lack of quotas was related to pressure from commercial agriculture interests that relied on short-term Mexican labor.  Hernandez Decl., at 7. More importantly, the lack of a quota does not negate the significant historical record reflecting racial animus. As the intent test recognizes, the fact that race was not the singular focus of lawmakers does not mean they had no impermissible motive at all. *Cf. Arlington Heights*, 429 U.S. at 255 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern.").

The racially discriminatory motives of the legislators who advocated for the original unlawful reentry law, which is substantially similar to the provision in force today, as well as the overt racism that characterized the immigration debate of the early twentieth century more generally, is relevant to the Court's determination of whether the 82nd Congress adopted the current 8 U.S.C. § 1326 with a similarly impermissible intent. However, because this historical background is remote in time to the Immigration and Naturalization Act of 1952, its probative value as to the motivations of the 82nd Congress is limited. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.").

ii.   **Relevant legislative history, sequence of events leading to enactment, and departure from normal practice of decision-making.**

In his motion, Wence makes the cursory argument that "*Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 55, at 17. The *Ramos* and *Espinoza* arguments are addressed *supra*. The Government responds that the lack of discriminatory purpose in subsequent legislative history indicates that the current 8 U.S.C. § 1326 was not enacted with such an impermissible purpose. ECF No. 58, at 12-15. Wence in turn employs an argument from the negative, asserting that by failing to clearly repudiate the 1929 Act's racist origins, the subsequent reenactments of 8 U.S.C. § 1326 are

necessarily tainted by the 1929 Act's discriminatory purpose. ECF No. 59, at 5. This argument, however, improperly seeks to shift the burden to the Government and incorporates fallacious reasoning.

The crux of the *Arlington Heights* intent test is to discern the motive of the government officials that engaged in the challenged action. Yet, Wence has failed to provide any legislative history or other evidence suggestive of the motives of the 82nd Congress to support his burden to show a discriminatory motive. Given this failure, Wence is left merely with the assertion that "evidence that racist motivations were jettisoned is absent from the record." *Id.* However, this is not entirely true, as shown below. Ultimately, the question for the Court is whether a law related to one that was stained by white supremacy can ever be cleansed without a formal condemnation of the earlier law. The answer is that it requires a more nuanced look at the surrounding circumstances, including the passage of time, the pronouncements made with respect to the new law, and the nature and purpose of the law. *Cf. Arlington Heights*, 429 U.S. at 266-68 (instructing that determining discriminatory purpose "demands a sensitive inquiry" into evidence of intent as may be available, including historical background and legislative or administrative history).

The current iteration of 8 U.S.C. § 1326 has been subject to numerous reenactments and amendments since its 1952 implementation. *See, e.g.,* Pub. L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub. L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub. L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub. L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub. L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

A review of the Congressional record surrounding the 1952 Immigration and Nationality Act reveals problematic rhetoric, if significantly less than the 1929 Act. *See, e.g.,* 82 Cong. Rec. 8116 (June 26, 1952) ("Unless the Government takes drastic measures to stop the wetback invasion, the gates will be opened for every kind of influence that could possibly be dreamed of to permit illegal entry into the United States."). Rhetoric of this vein was employed by seven senators throughout the debate immediately preceding the override of

President Truman's veto, wherein proposed amendments to the 1952 Act were discussed, including the "wetback amendment." 82 Cong. Rec. 8122 (June 26, 1952). However, this "wetback amendment" was voted down by a count of 11 'yeas' to 65 'nays.' 82 Cong. Rec. 8123 (June 26, 1952).

As the 1952 Act went to vote on whether to override President Truman's veto, Congressman Walter proclaimed on the floor, "The message before us points to many good and desirable provisions of the bill. Among them it lists the removal of racial barriers to immigration and naturalization; the removal of discriminations between sexes, and other improvements of the existing law. If the President's veto is sustained, none of these improvements will be written into law." 82 Cong. Rec. 8215 (June 26, 1952). Congressman Judd later echoed this sentiment, stating, "I submit that it is the President's veto that repudiates our basic religious concepts, our belief in the brotherhood of man, because it keeps our statutes as they are, with hundreds of millions of people in those crucial areas still outlawed because of the color or the pigment of their skin. … We must make clear to watching millions that the representatives of the people of the United States believe in trying to correct things that are inequitable; that we want to improve relations between our country and all the peoples in the world who want to be free[.]" 82 Cong. Rec. 8218 (June 26, 1952).

Ultimately, President Truman's veto was overridden. The1952 Act was passed by the House on June 26, 1952 by a vote of 278-112. 82 Cong. Rec. 8225 (June 26, 1952). It was then passed by the Senate on June 27, 1952 by a count of 57 to 26. 82 Cong. Rec. 8267 (June 27, 1952). Notably, every Senator who argued for the above described "wetback amendment" voted against the veto override, rendering whatever discriminatory purpose those eleven may have held inapplicable to the Act's passage. *Id.* Congressman Judd praised the passage, proclaiming, "The removal of racial bars from our immigration and naturalization laws represents for many people in this House, including myself, 10 long years of hard work. When I first came here, I said that if I could help get this injustice removed, it would be worth my giving up my profession to enter political life." 82 Cong. Rec. 8347 (June 27, 1952).

The 1952 Act was not without its issues. Congressman Judd went on to "recognize that the bill does not remove all the inequities in existing law, but it does remove a great

many[.]" *Id.* However, many of these inequities were later removed through subsequent alterations. For instance, the national origins quota system was abolished with the Immigration and Nationality Act of 1965.[9] *See generally* Pub. L. No. 89-236, Oct. 3, 1965, 80 Stat. 911-922.

More recently, the current body of immigration laws was amended by the Immigration Act of 1990. In reviewing the conference report on the 1990 Act, Congressman Morrison, Chairman of the House Immigration Subcommittee and House author of the Act, described the Act as historic legislation that "reforms our legal immigration system in ways more extensive and more broad than any legislation this Congress has ever considered before." 136 Cong. Rec. 86839 (Oct. 27, 1990). Congressman Morrison further observed that the law was strong on the improvement of family unification and provided temporary protected status for immigrants fleeing violence and death in El Salvador. *Id.* Congresswoman Pelosi expressed her support for the Act, describing herself as believing that immigration is good for our country. 136 Cong. Rec. 36843-44 (Oct. 27, 1990).

Meanwhile, as to the exclusion of undocumented individuals, Congressman Fish emphasized that the changes the legislation brought about would "not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or *when they have previously violated U.S. Immigration laws.*" 136 Cong. Rec. 36844 (Oct. 27, 1990) (emphasis added). These proclamations indicate thoughtful, non-racially motivated public policy considerations for the passed legislation, and lead to the inescapable conclusion that Wence's argument that the current 8 U.S.C. § 1326 remains tainted by the 1929 Act because "evidence that racist motivations were jettisoned is absent from the record" finds no basis in fact or in law. ECF No. 59, at 5.

Moreover, although Wence argues that the intent of the prior Congress remains legally operative until a future Congress makes an affirmative contrary showing, other courts

---

[9] Notably, this national origin quota system never applied to people born in the Republic of Mexico, and these immigrants, as with Canadian immigrants, were not subject to any immigration quota. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155.

that have considered the issue in the context of felon disenfranchisement provisions have rejected this approach. In *Johnson v. Governor of the State of Florida*, the Eleventh Circuit found that Florida's 1968 reenactment of a disenfranchisement provision adopted in 1868 "eliminated any taint from the allegedly discriminatory 1968 provision." 405 F.3d 1214, 1223 (11th Cir. 2005). In doing so, the court emphasized the lengthy deliberative process leading up to the 1968 enactment, during which there was no allegation of racial animus. *Id.*

Similarly, the Fifth Circuit in *Cotton v. Fordice* rejected the argument that a disenfranchisement provision could be invalidated solely on the basis that the original version of the provision was adopted with a discriminatory purpose, where the provision's challenger "offered no such proof regarding the current version." 157 F.3d 388, 392 (5th Cir. 1998). The Second Circuit echoed this proposition in *Hayden v. Paterson*, holding that because there had been "substantive amendment to New York's constitutional provision" and because of "the lack of any allegations by plaintiffs of discriminatory intent reasonably contemporaneous with the challenged decision," plaintiffs failed to state a plausible claim of discrimination with respect to the amended provision. 594 F.3d 150, 166-67 (2d Cir. 2010).

Like the challengers to the amended disenfranchisement provisions at issue in this line of cases, Wence would have the lack of an explicit and unified Congressional disavowal of the discriminatory purposes of the previous version render the current version unconstitutional. However, the extensive deliberative processes undertaken by Congress in 1952 and 1990, combined with the lack of legislative history directly addressing 8 U.S.C. § 1326, illuminates the absence of proof of the 82nd and 101st Congresses' discriminatory intent.

While Wence has not cited any part of the legislative history which discloses any racial animus in the law against Latinx aliens, a review of the legislative history reveals a balancing of valid immigration considerations such as providing support for Latinx immigrants displaced by violence while protecting the health and safety of the nation. The Court concludes that the legislative history for the 1952 and 1990 legislation does not reveal any discriminatory motive and provides no support for Wence's position.

### iii.    Disparate Impact

Although a showing of disparate impact on its own is typically insufficient to establish an equal protection violation, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242. Wence contends that Mexicans and other Latinx people make up the vast majority of individuals apprehended at the United States' borders, from which the Court should infer that Latinx people make up the majority of convictions under 8 U.S.C. § 1326. ECF No. 55, at 17-18. The Government does not rebut the statistics offered by Wence, but instead argues that any disparity is "a feature of Mexico's proximity to the United States – not discrimination." ECF No. 58, at 15.

While the Government's observation that immigration laws will almost always disproportionately affect Mexican and Latin American defendants is accurate, it does not answer the threshold question of whether the challenged law "bears more heavily on one race than another." *Davis*, 426 U.S. at 242. The Government's interpretation of disparate impact would seem to require a party challenging a law under the *Arlington Heights* intent test to show not only that a law had a discriminatory purpose, but also that it was discriminatorily applied. *See* ECF No. 58, at 15. However, an official action taken with a discriminatory purpose that disproportionately affects the disfavored group accomplishes the invidious motive, even if those tasked with its enforcement do not take the further step of selectively enforcing the law or policy against the disfavored group. In *Arlington Heights*, the Court found that the zoning restriction limiting the building of low-cost housing may have disparately impacted African Americans, even though that disparate impact was due to African Americans being disproportionately represented among those eligible for low-cost housing. *See Arlington Heights*, 429 U.S. at 270. Likewise, the disparate impact here is due to Latinx people being disproportionately represented among those apprehended at the border.[10] *Cf. United States v. Dumas*, 64 F.3d 1427, 1429 (9th Cir. 1995) (accepting fact that

---

[10] *Ramos v. Wolf*, which found that the revocation of Temporary Protected Status ("TPS") did not "bear more heavily" on one racial group than another, presents a somewhat different issue. *Wolf*, 975 F.3d at 898. Because individuals from Latin American countries were the primary beneficiaries of TPS designations, the revocation of virtually any TPS designation would disproportionately affect individuals from Latin America, which the Ninth Circuit found not to be probative of discriminatory intent under *Arlington Heights. Id.*

"the heavy penalties for crack-related offenses disproportionately affect Blacks because Blacks are more likely to possess crack than Whites" as evidence of disparate impact).

Importantly though, "[e]ven conscious awareness on the part of the decisionmaker that the policy will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role." *Lower Merion,* 665 F.3d at 552 (quoting *Frazier*, 981 F.2d at 95) (internal brackets omitted). The plurality in *Regents* merely restated the settled principle that disparate impact alone, absent other evidence of discriminatory motive, is insufficient to state a claim under *Arlington Heights*. *Regents,* 140 S. Ct. at 1915-16. It is certainly true that immigration policies can be expected to have a disproportionate impact on a particular racial group. But because these policies will often be "plausibly explained on a neutral ground," *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 275 (1979), the intent test requires additional evidence of an invidious motive before finding the law unconstitutional. *See Davis*, 526 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."); *see also Lower Merion*, 665 F.3d at 552 (quoting *Feeney*, 552 U.S. at 275) ("Just as there are cases in which impact alone can unmask an invidious classification, there are others in which – notwithstanding impact – the legitimate noninvidious purposes of a law cannot be missed.").

Accordingly, although Latinx people are likely disproportionately affected by 8 U.S.C. § 1326, the disparate impact alone in this case is not pronounced enough to give rise to an inference of discriminatory motive, given that the disparity is explainable on grounds other than race. *See Arlington Heights*, 429 U.S. at 266. The Court therefore finds that Wence has not met his burden of showing that Congress acted with a racially discriminatory motive in enacting 8 U.S.C. § 1326. As such, Wence's challenge is properly addressed under the rational basis standard of review. *Arlington Heights*, 429 U.S. at 265-58.

### c.  Wence fails to demonstrate that 8 U.S.C. § 1326 violates equal protection under rational basis review.

Under rational basis review, the challenged law must be upheld if it is "rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (*per curiam*). This Court must find that 8 U.S.C. § 1326 is rationally related to a legitimate

interest "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)) (internal quotation marks omitted).

Applying this deferential standard of review, the Court concludes that 8 U.S.C. § 1326 is rationally related to legitimate government interests. The United States undeniably has a legitimate interest in regulating its borders and preventing the entry of those who have committed violent and drug-related crimes, as well as the reentry of those who have violated immigration laws in the past. Indeed, this exact interest was articulated in the Congressional debate surrounding the 1990 reenactment of 8 U.S.C. § 1326 and related statutes. 136 Cong. Rec. 36844 (Oct. 27, 1990) (this legislation will "not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or *when they have previously violated U.S. Immigration laws.*") (emphasis added). As such, the Court finds that 8 U.S.C. § 1326 is rationally related to a legitimate government interest and does not violate equal protection. Necessarily, Wence's motion must be denied.

### III.     CONCLUSION

For the reasons set forth above, the Court finds that 8 U.S.C. § 1326 must be analyzed under *Arlington Heights*, but Wence fails to demonstrate that Congress enacted the statute with a racially discriminatory motive. Accordingly, the Court analyzes 8 U.S.C. § 1326 under the rational basis standard of review and finds that the statute does not violate equal protection. Therefore, Wence's Amended Motion to Dismiss the Indictment Because 8 U.S.C. § 1326 Violates Equal Protection Under Arlington Heights will be **DENIED** by separate Order.

**Dated:** June 16, 2021               */s/ Robert A. Molloy*
                                        **ROBERT A. MOLLOY**
                                        **Chief Judge**